IN THE CIRCUIT COURT FOR FREDERICK COUNTY, MARYLAND

| | |
|---|---|
| **STEVE MARTYNUSKA**<br>3830 Greenridge Drive<br>Monrovia, MD 21770<br><br>    Plaintiff<br><br>v.<br><br>**NATIONAL PAYMENT RELIEF, LLC**<br>**SERVE ON:**<br>State Department of Assessments<br>and Taxation, Statutory Agent<br>Corporate Charter Division<br>Attention: Service of Process<br>Suite 801<br>301 W. Preston Street, Suite 801<br>Baltimore, Maryland 21201<br><br>And<br><br>**ALBERTO ARTASANCHEZ**<br>40 Fayette Street, Suite 36<br>Perth Amboy, NJ 08861<br><br>And<br><br>**RE/MAX RESULTS, INC.**<br>SERVE ON:<br>Sandra Fouche, Resident Agent<br>6767 Covenant Court<br>Frederick, MD 21702<br><br>And<br><br>**ROSALIE BUCCI**<br>512 Pennsylvania Ave., #1<br>Fort Washington, PA 19034<br><br>And<br><br>**JOHN DOES 1-10**<br><br>    Defendants | Case No.: _____ |

1

## COMPLAINT & REQUEST FOR JURY TRIAL

Plaintiff Steve Martynuska ("Mr. Martynuska"), through his undersigned counsel files this Complaint and Request for Jury Trial against Defendants National Payment Relief, LLC ("NPR"), Alberto Artasanchez ("Artasanchez"), Re/Max Results, Inc. ("Re/Max"), Rosalie Bucci ("Bucci"), and John Does 1-10 ("Unknown Eviction/Cleaner Company and Employees")(collectively "Defendants"), and says in support:

## I. INTRODUCTION

1. The underlying matter involves just one of thousands of other similar situations across the State where homeowners are (i) seeking to change and modify their current mortgage loans without requesting additional credit, (ii) complying with all information requests of their servicer/lender, hoping to obtain changes and modifications, yet (iii) having all their reasonable steps ignored in bad faith, leaving the homeowners with no other option but to seek assistance of the Courts to recover from the illegal harm and damages they have sustained.

2. These claims concern the utter failure of Defendants NPR, Bucci, and Artasanchez to comply with Maryland debt collection and common law in relation to Mr. Martynuska's reasonable and appropriate requests to modify his second mortgage loan subject to this action. In addition, Re/Max, Artasanchez, Bucci, and Unknown Eviction/Cleaner Company and Employees, conducted an illegal eviction and lockout of Mr. Martynuska from his home when it had no legal right to do so and, as such, violated its duties pursuant to their Maryland real estate license(s).

3.  Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation.  Mr. Martynuska does have a sustainable solution, has negotiated a modification of his first mortgage and had thought he was negotiating a payoff of his second lien allegedly held and owned by NPR, yet the Defendants, by and through their authorized agents and employees, threatened a wrongful foreclosure—otherwise known as an adverse action—on Mr. Martynuska's home and property without having first complied with state law or regulations, and doing so without a proper order of this Court.

4.  Further, and very significant to Mr. Martynuska, but for the botched loss mitigation efforts by NPR, Bucci, and Artasanchez, Mr. Martynuska would not have suffered the direct and proximate damages resulting from the unresolved mortgage situation which continues to cause significant economic and non-economic losses for him.

## II.  PARTIES

5.  Mr. Martynuska is a resident of the State of Maryland and is the owner of the real property commonly known as 3830 Greenridge Drive, Monrovia, MD  21770 ("the Property").  His agent described herein is his Wendy Cottrell.

6.  Defendant National Payment Relief, LLC ("NPR"), is a national debt buying, second mortgage company which acquires second mortgage loans when they are in default and then offers homeowners and consumers financial advice to minimize the negative consequences and impact to their credit score and to avoid foreclosure.   NPR is located at 512 Pennsylvania Avenue, Fort Washington, PA  19034 and upon information and belief is organized under the

laws of the Commonwealth of Pennsylvania.  NPR is not now nor ever has been licensed as a Maryland Mortgage Lender or Collection Agency.

7.    Alberto Artasanchez   ("Artasanchez") is a resident of the State of New Jersey and upon information and is a managing member of NPR where he also directs its day to day operations concerning foreclosures, acquisition of mortgage notes, evictions, and selling of properties through a network of REO realtors affiliated with NPR.  These beliefs are based upon his representations to the Plaintiff and the agents of the Plaintiff as well as his advertisements on the Internet.  Rosalie Bucci ('Bucci") is a member of NPR as previously represented to this Court in the Foreclosure Action.

8.    Re/Max Results, Inc. ("Re/Max") is a licensed Maryland real estate company with more than 75 authorized agents who work in its office.  Included among those authorized agents is Marie Floyd.  Re/Max provides a variety of services for Marie Floyd in exchange for a percentage of the income she arranges including income from her REO listing and sales services for NPR.  Re/Max's actions described herein were as a collector attempting to collect upon a debt arising out of a consumer transaction.  Upon information and belief Floyd and Bucci have a professional relationship as licensed realtors.

9.    John    Does    1-10    ("Unknown    Eviction/Cleaner    Company    and Employees")(collectively "Defendants") are the individuals who carried out the illegal eviction and illegal seizure of the Plaintiff's property and stole his possessions without any legal or equitable right to do so.  Unknown Eviction/Cleaner Company and Employees acted under the scope and authority

granted to them by NPR, Artasanchez, Re/Max, and Marie Floyd. This belief is based upon the admissions of Marie Floyd to the Plaintiff's agents.

10. Not named as parties in this action, Cindy Diamond and her law firm Rosen Hover PA, with offices in Baltimore, Maryland, acted as the Substitute Trustee(s) for NPR in the underlying foreclosure action in this Court. Artasanchez directed Diamond and Rosen Hover PA to take certain actions on behalf of NPR in the foreclosure action but took other steps such as the illegal eviction and seizure of the Plaintiff's Property and possessions without any advice from Diamond and Rosen Hover PA. This belief is based upon the admissions of Diamond to the Plaintiff's agent. Upon learning of the illegal seizure and taking of Plaintiff's property, however, neither Diamond nor Rosen Hover PA disclosed these facts to the Court.

### III. JURISDICTION & VENUE

11. This Court has proper jurisdiction because Defendants transact business and perform work and services in Maryland and each has availed themselves to the jurisdiction of this Court through their appointed agents and affiliates, including Diamond, in this Court.

12. Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

13. Venue is appropriate in this Court because the Defendants conduct business within Frederick County, Maryland.

### IV. FACTS

A.    **The Foreclosure Crisis**

14.  Over the last five years, Maryland, and indeed, the United States, has been in a foreclosure crisis.   Recent news reports have established that one in ten American homes is at risk of foreclosure.

15.  The number of Maryland properties with foreclosure filings has increased substantially throughout the last five years.

16.  Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps even, surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

17.  The foreclosure crisis is far from over.   Economists predict that interest rate resets on the riskiest of lending products have yet to reach their zenith.

B. **Maryland's Response to the Foreclosure Crisis**

18.  In 2007, at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was underway.   The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according to the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family

home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.[1]

19. To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court.[2]

20. In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate practices. These bills were passed with nearly full bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

---

[1] Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007) *available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf (footnotes omitted).

[2] *See Id.* at 40-43.

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

*Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)*, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

*Senate Bill 217/House Bill 360* define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;

• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or

8

• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.[3]

21. The Maryland Court of Appeals also adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure.   Writing for the Committee the Honorable Alan M. Wilner explained:

The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.[4]

---

[3] Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) *available at* http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

[4] Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

22. In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the…servicing…of any mortgage loan, including, but not limited to…(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20.

C. **Maryland's Response to the Collection Agency and Debt Collection Crisis as Related to the Plaintiff**

23. NPR is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(4)(6) since it is a business engaged in purchasing and collecting on defaulted debts by using interstate wires and mail among other acts. *See also, Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) (the FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not. *See Bailey v. Security Nat'l Servicing Corp.*, 154 F.3d 384, 387 (7th Cir.1998); *Whitaker v. Ameritech Corp.*, 129 F.3d 952, 958 (7th Cir.1997); *see also Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403-04 (3d Cir.2000); *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106-07 (6th Cir.1996); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir.1985)").

24. NPR and Re/Max each act as a "collection agency" as defined by Maryland Collection Agency Licensing Act, MD. ANN. CODE, BUS. REG. ART., § 7-101, et seq. ("MCALA").  However, neither has now nor at any time in the past ever had a collection agency license as required by MCALA.

25. As part of its routine and on-going collection practices NPR collects monthly mortgage payments and/or reinstatement sums or short-payoffs, by and through the mails and interstate wires through the services of its affiliate FCI Lender Services, Inc.  NPR also attempts to collect through civil litigation in Maryland Courts authorized by its owners and employees, including Artasanchez, filed as foreclosure actions.

26. As part of its routine and on-going collection practices, NPR offers through its affiliates, owners, and employees, including Artasanchez, short-payoffs for small fractions of the defaulted, distressed debts it has purchased, including the second lien debt of the Plaintiff which NPR acquired from Wells Fargo Bank while it was in default.

27. NPR is not registered to do business in the State of Maryland as of April 17, 2013.

28. Under MD. ANN. CODE, BUS. REG. § 7-301, a person must have a license to do business as a collection agency in the State of Maryland.

29. The Maryland Commissioner of Financial Regulation has clearly stated the state regulator's position regarding the legal requirements under Maryland law

for a person who acquires consumer debt after default and files lawsuits in

Maryland to collect the debt:[5]

> ... 4. The position of the Agency is that, unless otherwise exempt, a person
> who brings actions in Maryland State courts to collect consumer claims  which
> were acquired when the claims were in default is knowingly and willfully
> doing business as a "collection agency" in the State under [Bus. Reg.] § 7-
> 101(c). This includes, but is not limited to, the named Plaintiffs in such judicial
> actions, which will normally be the owners of the consumer debt.
>
> 5. Thus the Agency's position is that a Plaintiff in a Maryland State court
> action brought to collect a consumer claim which was acquired when the claim
> was in default is required to be licensed as a collection agency under MCALA,
> and is subject to the regulatory authority of the Agency in the conduct of that
> litigation.
>
> 6. The position of the Agency is that a person who brings judicial actions in
> Maryland State courts to collect consumer claims which were acquired when the
> claims were in default also meet the definition of "collector" under CL § 14-
> 201(b) of the Maryland Consumer Debt Collection Act ("MCDCA," at
> Commercial Law Article ("CL"), §  14-201 *et seq.*, Annotated Code of
> Maryland) and of "debt collector" under 15 U.S.C. § 1692(a) of the Fair Debt
> Collection Practices Act ("FDCPA," at 15 U.S.C. § 1692, *et seq.*). ...

30. Neither NPR nor Artasanchez are now or have ever been licensed by Maryland

as a "collection agency" during the relevant periods related to this action.

31. Every collection effort in Maryland by NPR or Artasanchez without a Collection

Agency license, including each and every foreclosure action filed in Maryland

courts on their behalf as well as the collection of any mortgage payments, and each and

every judgment lien filed in Maryland, is an unfair or deceptive trade practice since

these actions were committed with the right to do so as stated by the legislature.

---

[5] *In the Matter of: Midland Funding, LLC, et al.,* Before the Maryland State
Collection Agency, Licensing Board in the Office of the Commissioner of
Financial Regulation, DFR-FY-2010-063.

32. Defendants NPR, Re/Max, and Artasanchez acted as debt collection agencies in Maryland including various collection activities and illegal seizure of the Plaintiff's home and property.

33. Defendants' actions as a debt collection agency against Plaintiff were done without a mandatory, state license as a "collection agency" by the Maryland Commissioner of Financial Regulation.

34. Before the 2007 session of the Maryland General Assembly, debt buyers like NPR and Artasanchez sought to avoid Maryland statutes and regulation by asserting that they were not subject to Maryland statues addressing collection agencies. *See,* Legislative History for 2007 chap. 472 (Bus. Reg. 7-101) HB 1324. As a result the 2007 General Assembly required NPR, Artasanchez, and other debt buyers to acquire a license by October 1, 2007. *Id.*

35. Then Maryland Commissioner of Financial Regulation, Charles W. Turnbaugh, Commission of Financial Regulation explained the purpose of the bill, HB 1324, at the time as follows:

> ... The law does not require licensing for businesses that only collect their **own** consumer debts, unless the business uses a name or other artifice that indicates that another party is attempting to collect the consumer debt. However, the evolution of the debt collection industry has created a "loophole" used by some entities as a means to circumvent current State collection agency laws. Entities, such as "debt purchasers" who enter into purchase agreements to collect delinquent consumer debt rather than acting as an agent for the original creditor, currently collect consumer debt in the State without complying with any licensing or bonding requirement. The federal government has recognized and defined debt purchasers as collection agencies, and requires that these entities fully comply with the Federal Fair Debt Collection Practices Act. **This legislation would include debt purchasers within the definition of a "collection agency," and require them to be licensed by the Board before they may collect consumer claims in this State** ... *[emphasis added].*

36. However, Defendants did not have the mandatory license required by MCALA but continued their business of collecting debts acquired in default and filed collection lawsuits in Maryland courts without the right to do so.

37. In sworn testimony before this Court, Kelly Mack from the Maryland Department of Labor, Licensing, and Regulation has testified that "[i]t has been the consistent position of the [Maryland State Collection Agency] Board that a Consumer Debt Purchaser (i.e., a person who acquires consumer claims which are in default at the time of the acquisition) that collects consumer claims through litigation is a 'collection agency' under Maryland law and is required to be licensed as such, regardless of whether an attorney representing the Consumer Debt Purchaser in the litigation is a licensed collection agency."

38. Following enactment of HB 1324 the Maryland Commissioner of Financial Regulation issued its official position as DLLR Advisory Notice No. 07-06 ("Advisory"). The Advisory clearly stated the Commissioner's official position on the changes to MCALA: that is "... effective October 1, 2007 any person engaged in the collection of a consumer claim the person owns, if the claim was in default when the person acquired it, is required to be licensed as a collection agency pursuant to HB 1324 ...".

39. Defendants willfully and knowingly sought to directly or indirectly collect debts allegedly acquired in default and, therefore, acted as debt collection agencies in Maryland without a license to do so.

D. **Plaintiff's Involvement with Defendants' Illegal Mortgage Servicing, Debt Collection, and Eviction Efforts**

40. Like thousands of other Maryland residents, Plaintiff suffered a significant reduction of income during the recent recession. He attempted in good faith to mitigate this issue by supplementing his income but his efforts in this regard were limited. He also sought to modify his first and second mortgage liens on the Property to sums which were sustainable for reduced income.

41. J.P. Morgan Chase Bank, National Association is the holder and mortgage servicer of the Plaintiff's first lien mortgage. Plaintiff's loss mitigation efforts with Chase have resulted in a sustainable modification as of March 14, 2013.

42. Wells Fargo Bank, NA was the holder and mortgage servicer of Plaintiff's second lien mortgage on behalf of Eagle Crest, LLC until January 26, 2012 when Eagle Crest conveyed its interest in the loan and associated Deed of Trust to NPR. Eagle Crest, LLC had acquired the rights and interests in the Plaintiff's second lien mortgage from Wells Fargo on January 12, 2012.

43. Plaintiff's second lien mortgage was secured by his home and Property.

44. The last payment made on the Plaintiff's second lien mortgage was applied to the loan for a monthly sum due in 2011.

45. Both Eagle Crest, LLC and NPR acquired their interests in the Plaintiff's second lien mortgage when the loan was in distress and in default since the Plaintiff had failed to make the timely payments before the date of acquisition by each entity.

46. Sometime before July 24, 2012 NPR and Artasanchez retained Diamond and Rosen Hoover P.A. to attempt to collect upon their behalf from the Plaintiff on the Plaintiff's second lien mortgage NPR then and now holds.

47. On or about July 24, 2012 NPR and Artasanchez authorized Diamond and Rosen Hoover P.A. to send the Plaintiff a Notice of Intent to Foreclose for the purpose of attempting to collect upon the Plaintiff's second lien mortgage.

48. On or about September 28, 2012 NPR and Artasanchez authorized Diamond and Rosen Hoover P.A. to commence a foreclosure proceeding again the Plaintiff and his home and Property in this Court. *See Diamond v. Martynuska*, Case No. 10C12002924 ("Foreclosure Action"). In the Foreclosure Action, NPR provided certain papers to Diamond and Rosen Hoover P.A. in support of its indirect attempt to collect upon the Plaintiff's second lien mortgage including:

   a. Preliminary Loss Mitigation Affidavit dated September 19, 2012 and signed by NPR's authorized representative and Member Rosalie Bucci.

   b. Deed of Appointment of Substitute Trustees dated September 20, 2012 signed by NPR's authorized representative and Member Rosalie Bucci.

   c. Non-Military Service Affidavit dated September 20, 2012 signed by NPR's authorized representative and Member Rosalie Bucci.

   d. Affidavit of Right to Foreclose and Statement of Deed of Trust Debt dated September 20, 2012 signed by NPR's authorized representative and Member Rosalie Bucci.

   e. Affidavit of Note and Note ownership dated September 20, 2012 signed by NPR's authorized representative and Member Rosalie Bucci.

   f. Affidavit of Default and Right to Foreclose dated September 20, 2012 signed by NPR's authorized representative and Member Rosalie Bucci.

49. During the Foreclosure Case proceedings, NPR, through its authorized representatives and members Rosalie Bucci and Artasanchez intended to lull the Plaintiff into not exercising his rights under Maryland law (to file timely and appropriate requests for foreclosure mediation and/or to stay or dismiss the improper action) by negotiating with the Plaintiff an alternative to foreclosure. However, neither Bucci, Artasanchez, nor NPR ever disclosed to Plaintiff that while appearing to negotiate with him and his agent(s) in good faith, NPR authorized Diamond and Rosen Hoover P.A. to conduct a foreclosure sale. These beliefs are based upon the following facts:

   a. An email from Rosalie Bucci to Plaintiff's agent on December 4, 2012 at 1:23 PM indicating that NPR was seeking certain information from Mr. Martynuska for NPR's "finance committee" could consider him for a "payment plan."

   b. An email from Rosalie Bucci to Plaintiff's agent on December 11, 2012 at 11:14 AM again requesting certain information from Mr. Martynuska in order to stop a "scheduled sale date" organized by NPR's "legal department."

   c. An email from Rosalie Bucci to Plaintiff's agent on December 12, 2012 at 3:20 PM again requesting certain information from Mr. Martynuska in order to stop the "foreclosure sale scheduled for January 14, 2013."

   d. An email from Artasanchez to Plaintiff's agent on or about December 28, 2012 again requesting certain information and payments from Mr.

Martynuska in order to stop the "foreclosure sale scheduled for January 15, 2013 at 11:20 a.m."

e. An email from Rosalie Bucci to Plaintiff's agent on December 27, 2012 at 4:41 PM again requesting certain information from Mr. Martynuska in order to stop the foreclosure including informing concerning Mr. Martynuska's efforts to modify his first mortgage lien with Chase.  In addition Ms. Bucci on behalf of NPR demanded payments from Mr. Martynuska without the legal right to do so, since NPR was not licensed as a Maryland collection agency, through an ACH authorization.

f. An email from Artasanchez to Plaintiff's agent on January 11, 2013 at 11:36 A.M. again demanding payments by "wire" transfer from Mr. Martynuska in order to stop the scheduled foreclosure sale.

g. An email from Artasanchez to Plaintiff's agent on January 11, 2013 at 11:55 A.M. asking the Plaintiff's agent to "talk about the results from the loss mitigation department" at NPR with "Rosalie Bucci."

h. Emails from Rosalie Bucci to Plaintiff's agent on January 21, 2013, at 9:23 A.M. and January 24, 2013 at 12:37 P.M. again requesting certain information and temporary payment of $200 per pay cycle from Mr. Martynuska in order to stop the foreclosure until he receives a final modification from Chase.

i. An email from Rosalie Bucci to Plaintiff's agent on February 1, 2013 at 11:55 A.M. again requesting payments from Mr. Martynuska in order to stop the foreclosure.

j. An email from Bucci to Plaintiff's agent on February 8, 2013 at 10:18 A.M. representing to Mr. Martynuska that might be eligible for a negotiated settlement concerning his departure of the Property.

k. An email from Rosalie Bucci to Plaintiff's agent on February 19, 2013 at 2:51 P.M. requesting certain payment(s) by wire transfer from Mr. Martynuska in order to stop the foreclosure along with a "signed forbearance agreement with automatic payments of $350 per month."

l. An email from Rosalie Bucci to Plaintiff's agent on February 19, 2013 at 4:43 P.M. again requesting payments from Mr. Martynuska in order to stop the foreclosure.

m. An email from Rosalie Bucci to Plaintiff's agent on April 2, 2013 at 11:15 A.M. again requesting information from Mr. Martynuska to establish "a plan for the 2nd mortgage."

n. An email from Rosalie Bucci to Plaintiff's agent on April 5, 2013 at 2:06 pm requesting Mr. Martynuska complete an attached ACH Authorization form ASAP as the first payment is due now AND requesting Mr. Martynuska submit a proposal to pay a lump sum by the end of June.

o. An email from Rosalie Bucci to Plaintiff's agent on April 15, 2013 at 6:43 A.M. again requesting information from Mr. Martynuska concerning his modification of the Chase 1st lien.

p. An email from Alberto Artasanchez to Plaintiff's agent on May 9, 2013 at 4:21 PM requested Plaintiff contact Rosalie Bucci at his convenience to discuss his belongings at 3830 Greenridge Drive Monrovia, MD 21770.

q. An email from Rosalie Bucci on behalf of NPR and Artasanchez to Plaintiff's agent on May 14, 2013 at 9:38 A.M. asking the Plaintiff's agent if indicating that NPR demanded that Mr. Martynuska pay it $30,000 to receive his home back even though NPR knew at the time that the eviction was illegal.

r. An email from Diamond on behalf of NPR and Artasanchez to Plaintiff's agent on May 14, 2013 at 2:44 P.M. asking the Plaintiff's agent if Mr. Martynuska pay-off the second lien for the sum of $30,000 in exchange for the sale being undone and Mr. Martynuska waiving any claims he has for the recovery of his processions and the illegal eviction.

s. An email from Diamond on May 15, 2013 8:05 am to Plaintiff's agent in respect to Mr. Martynuska's personal property stating he needs to speak with Ms. Bucci or Mr. Artasanchez regarding any eviction action as they would have the information Mr. Martynuska was seeking.

50. Throughout none of the communications described in the preceding paragraph, except those which occurred after the illegal eviction was discovered, did NPR or its members, employees, or attorneys ever disclose to Mr. Martynuska that NPR had actually conducted a foreclosure sale of the Plaintiff's property on March 12, 2013. Defendants' communications were designed to entice Mr. Martynuska into believing the Defendants were actually working with him within the law and in

good faith when fact the Defendants were not doing either and instead knowingly intended to trick the Plaintiff to pay the Defendants sums of money, directly or indirectly, that NPR was not entitled to collect through the Maryland court system since NPR is an unlicensed collection agency.

51. Further, Plaintiff relied upon the representations of the Defendants, directly and indirectly described in ¶¶ 48-49 in good faith because no reasonable person would have believed that the Defendants would represented themselves to be professionals would have acted outside the scope of the law and regulations covering this situation.  If fact the Defendants' plan was to take advantage of Plaintiff's reasonable reliance to further lull the Plaintiff into believing each were directly and indirectly acting within the law while illegally acquiring his property and home.

52. NPR through its authorized agents, Artasanchez, Bucci, Re/Max and Unknown Eviction/Cleaner Company and Employees conducted an illegal eviction of the Plaintiff from the Property on or before May  6, 2013 in which his possessions and property were stolen and seized including but not limited to the following:

| | | |
|---|---|---|
| a. | Water Cooler | $200 |
| b. | Dishes Cookware Etc. | $1000 |
| c. | Microwave | $200 |
| d. | Toaster Oven | $200 |
| e. | Kitchen Table/Chairs | $200 |
| f. | Lazy Boy Chair | $150 |
| g. | Couch | $250 |
| h. | 43" TV | $1900 |
| i. | 5 Way Sound System | $500 |
| j. | Sirius Receiver | $100 |
| k. | Golf Car Organizer Trunk | $100 |
| l. | Auto Mechanic Hand Tools | $5,000 |
| m. | 134AC Gages | $200 |
| n. | TV Stand | $200 |

| | | |
|---|---|---|
| o. | H&K .40 Cal. Semi-Automatic Pistol | $500 2 clips |
| p. | Remington .270 Mtn Rifle | |
| q. | Burris Scope | $800 |
| r. | Mossberg 12 Gage Shot Gun | $100 |
| s. | .22 Cal. Rifle | $100 |
| t. | Divot Tools from Cypress Point Golf Club X 2 | $150 |
| u. | 1 Queen Size Bed | $1000 |
| v. | 1 King Size Bed | $2000 |
| w. | Computer | $1,800 |
| x. | Printer | $200 |
| y. | Desk | $300 |
| z. | Chair | $100 |
| aa. | Vintage LP Vinyl Records, some collectors' items | $7,500 |
| bb. | In excess of 40 CD's some collectors' items | $2,500 |
| cc. | Various Custom – No longer Made Golf Equipment: | $12,000 |
| dd. | Clothes (Work – Golf – Dress – Short – Pants) | $12,000 |
| ee. | US Open Shirts – Vest | $800 |
| ff. | Hunting clothes | $1,500 |
| gg. | Mephisto Shoes x 2 | $700 |
| hh. | 2 Vintage Fender Telecasters with cases | $8,000 |
| ii. | 1 Yamaha Acoustic Electric Guitar | $400 |
| jj. | 2 Omega Watches | $7,700 |
| kk. | 1 multi carat Diamond platinum necklace | $2,500 |
| ll. | Klein Road Racing Bike | $3,500 |
| mm. | 42" deck Floor ac portable unit | $500 |
| nn. | Family Heirlooms/ Antiques | $50,000 |

- High School Ring
- Work Diamond Club Ring
- Cross Necklace from parents for confirmation
- Vatican Coins Bless by the Pope
- Family Pictures Living and Dead
- Vacation Pictures
- High school Letterman Jacket
- Dale Hunter Signed Poster
- No Doubt Platinum Record
- Dean Smitch UNC Poster
- David Duval Signed Picture British Open
- Newspaper clippings and pictures from Plaintiff's Trip to England

| | | |
|---|---|---|
| oo. | Important Personal Papers (Passport, Social Security Card, Birth Certificate, Filing cabinet with personal and financial info) | $20,000 |

53. Upon notifying Diamond of the illegal eviction of the Plaintiff from his Property, she denied any knowledge of the event and represented to Mr. Martynuska's agent that she would never have authorized such an action.

54. The Foreclosure action never had a ratified sale.

55. NPR never paid the purchase price determined at the foreclosure sale held at March 12, 2013.

56. Legal title to the Property never conveyed to NPR after the foreclosure sale held at March 12, 2013.

57. This Court never granted in the Foreclosure Action or otherwise the right to NPR to take possession of the Property.

58. NPR never gave the Plaintiff or his authorized notice that it intended to conduct any inspections of the Property.

59. Re/Max, without the right to do so, has advertised the Plaintiff's home and property for sale including but not limited from January 3, 2013 through April 4, 2013 and May 6, 2013 through May 15, 2013.

60. Upon retaining counsel on or about May 15, 2012, Mr. Martynuska learned for the first time of the illegal status of Defendant NPR as an unlicensed mortgage lender and collection agency under Maryland law.

61. In an effort to mitigate the damages incurred by Mr. Martynuska, Diamond, Artasanchez, and NPR moved this Court to withdraw the report of sale in the Foreclosure Action on or about May 16, 2013.  In this motion, the moving parties failed to disclose to the Court the circumstances about the illegal eviction and seizure of Plaintiff's property and possessions.

62. On May 16, 2013 at 6:44 P.M. Plaintiff demanded the keys to the Property be returned to him on May 16, 2013 since the Defendants had changed the locks to the Property. Artasanchez, and NPR failed to provide Plaintiff with the keys as requested. Instead, Artasanchez requested on May 17, 2013 at 7:38 P.M. that Mr. Martynuska access the Re/Max lockbox on the Property to obtain the keys. In good faith Mr. Martynuska's agent attempted to access the Property for said purpose because the lock-box was not accessible since it was located behind a locked storm door.

63. On May 15, 2013, Mr. Martynuska's agent contacted Marie Floyd at Re/Max to request Mr. Martynuska's property and possessions be returned. Ms. Floyd represented that she did not hire the company, i.e. Unknown Eviction/Cleaner Company and Employees, to perform the eviction and these persons were instead hired by NRP. Ms. Floyd also stated she was out of town and would provide the identity of Unknown Eviction/Cleaner Company and Employees the next day but she has failed to do so. Ms. Floyd also retained a neighbor of the Property, i.e. "Scotty", to maintain and cut the grass at the property.

64. In the course of investigating the irregularities related to the Defendants, Mr. Martynuska has also learned from Chase that someone on May 6, 2013 at 4:46 pm not authorized by him, contacted Chase pretending to be him and requesting a payoff amount be released to him over the phone because "I plan to Short Sale my home." That same day, May 6, 2013 at 5:01 pm not authorized by him, contacted Chase pretending to be him and again requesting a payoff amount be released to him over the phone because "I plan to Short Sale my home" Upon

information and belief this person was Artasanchez or some other person affiliated with NRP who made this illegal call and unauthorized representation to Chase. This belief is based upon the records of Chase of where the phone call came from (i.e. area code) which matches the same area code used by Artasanchez.

## E. DAMAGES

### a. Economic Damages Suffered by Plaintiff

65. Plaintiff has had his possessions and property taken from him without the legal right to do so by the Defendants. These include those described and itemized in ¶52.

66. Plaintiff now must pay to change his locks to his own house at an estimated cost of $400.

67. Plaintiff has lost time at work as a result of the action of the Defendants to manage his affairs, report to the sheriff's office the theft of his guns and other possessions, and as a result of the emotional stress (discussed below). The value of this lost time exceeds $1,000 and is on-going.

### B. Non-economic Damages Suffered by Plaintiff

68. As a result of the illegal and unauthorized foreclosure action taken against him home, Mr. Martynuska suffered damage to his credit.

69. As a result of the illegal and unauthorized foreclosure action taken against him and his home and Property, Mr. Martynuska has and continues to suffer mental

depression, anguish, anxiety, embarrassment, emotional pain and suffering, and has become withdrawn socially.

## COUNT I -- VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT, MD CODE, COMM. LAW, § 14-201 *et seq.*
### *(Against All Defendants)*

70. Mr. Martynuska reiterates and incorporates every allegation above as if set forth herein in full and adds:

71. By threatening and proceeding an intent to foreclose based upon practices described above, NPR, Artasanchez, and Bucci have acted as collectors as that term is defined by § 14-201(b) of MD. CODE, COMM. LAW.

72. By seizing control of the Property without the right to do so as part of NPR's, Artasanchez's, and Bucci's efforts to collect from Mr. Martynuska an alleged debt arising out of a consumer transaction, Re/Max and Unknown Eviction/Cleaner Company and Employees, have also acted as collectors as that term is defined by § 14-201(b) of MD. CODE, COMM. LAW.

73. Mr. Martynuska is a person defined by § 14-201(d) of MD. CODE, COMM. LAW.

74. The underlying mortgage transaction, threats of foreclosure, and the illegal seizure of the Property as a means towards debt collection related to this complaint constitutes a "consumer transaction" as defined by § 14-201(c) of MD. CODE, COMM. LAW.

75. Defendants have each claimed, attempted, or threatened to enforce a right with knowledge that its right did not exist under Maryland law and Maryland foreclosure law and procedures.

76. Mr. Martynuska's damages as alleged herein were proximately caused by Defendant's actions, direct and indirect, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 65-69 above.

WHEREFORE, Mr. Martynuska prays for the following relief against Defendants for their violations of the Maryland Consumer Debt Collection Act:

   A. A money judgment of all damages caused by Defedants' actions, directly or indirectly, in the sum of $350,000;

   B. His costs including attorneys' fees as well as pre- and post-judgment interest;

   C. Such other and further relief as the nature of their cause may require.

## COUNT II – VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*
### *(Against All Defendants Except Re/Max)*

77. Mr. Martynuska reiterates and incorporates every allegation above as if set forth herein in full and adds:

78. The mortgage loan transactions and foreclosure practices as set forth herein of the Defendants against Plaintiff are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

79. Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and the collection of debts. Section 13-316 requires servicers like BOA to respond to inquiries from consumers within 15 days.

80. The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

81. By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, Defendants have committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act.  Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

82. Defendants' conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. Martynuska who in fact was deceived or misled, causing injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a foreclosure action by Defendants directly and indirectly.

83. Mr. Martynuska's damages as alleged herein were proximately caused by Defedants' actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 65-69 above.

WHEREFORE, Mr. Martynuska prays for the following relief against each Defedant except for Re/Max for its violations of the Maryland Consumer Protection Act:

A. He be awarded as part of this claim a sum of no less than $250,000 which represents his compensatory damages as a result of the Defendants' direct and indirect, unfair or deceptive practices as described herein;

B. He be awarded his reasonable attorney's fees and costs; and

C. That her claim should include such other and further relief as the Court deems just and proper.

## COUNT III – MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. ANN. CODE, REAL PROP. § 7-401 MD. REAL PROP., *et seq.*
### *(Against All Defendants)*

84. Mr. Martynuska reiterates and incorporates every allegation above as if set forth herein in full and adds:

85. The Maryland Mortgage Fraud Protection Act, Md. Ann. Code, Real Prop. § 7-401 MD. REAL PROP., *et seq.* ("MMFPA") governs the relationship between the Defendants and Plaintiff.

86. Md Ann. Code., Real Prop. § 7-401 (c) provides: "Homeowner" means a record owner of residential real property. The Plaintiff is the record owners of the residential property in question and therefore is the Homeowner.

87. Md Ann. Code., Real Prop. § 7-401 (e) provides "Mortgage lending process…includes [t]he…servicing…of a mortgage loan."

88. Md Ann. Code., Financial Institutions code. § 11-501 (k)(1) provides: "Mortgage loan" means any loan or other extension of credit that is: (i) Secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) If for personal, household or family purposes, in any amount."

89. The MMFPA works to protect the interests of all parties to mortgage issues in Maryland from misstatements, misrepresentations and omissions; in this instance the MMFPA works to protect borrowers like Mr. Martynuska from mortgage companies and so-called professionals like the Defendants and ensure a level, fair playing field between all borrowers and professionals.

90. Mr. Martynuska is a homeowner in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of her residential mortgage loan as it relates to a foreclosure action or threat of foreclosure which is an attempt to collect a certain sum on the mortgage transaction through the value of her property.

91. Md Ann. Code., Real Prop. § 7-401 (d) provides: "'Mortgage fraud' means any action by a person made with the intent to defraud that involves: (1) Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process; (2) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; (3) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section; ...or (5) Conspiring to violate any provisions of item of (1), (2) or (3) of this section.

92. The Defendants have committed Mortgage Fraud by:

   a. Knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process, including failing to respond to the Plaintiff's requests for a modification or change of her mortgage loans and the right of the Defendants to seize the Property as part of its foreclosure collection practices, with the intent that the misstatements, misrepresentations and omission be relied on by the Plaintiff and the general public;

   b. Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Plaintiff.

   c. Conspiring together, before and after the fact, to illegally seize the Plaintiff's Property and possessions through the use of this Court but without the legal right to do so.

93. Mr. Martynuska's damages as alleged herein were proximately caused by Defendants' actions, direct and indirect, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 65-69 above.

   WHEREFORE, Mr. Martynuska requests the following on his behalf based upon the Defendants' violations of the MMFPA:

A.   He be awarded as part of her claim the sum of no less than $350,000 which represents  her compensatory damages as a result of the Defendants' illegal practices and misrepresentations as described herein;

B.  The Plaintiff be awarded statutory damages equal to three times his actual damages for the Defendants' violations;

C.  He be awarded as part of the claim their reasonable attorney's fees and costs; and

D.  That his claim should include such other and further relief as the Court deems just and proper.

## COUNT IV

### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICE ACT,

### 15 U.S.C. § 1692, et seq.

**(Against All Defendants except Re/Max)**

94. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

95. Defendants NPR, Artasanchez, Bucci, and Unknown Eviction/Cleaner Company and Employees, acquired their interests and/or servicing and ownership rights to Plaintiffs' mortgage during a period in which NPR alleges the loan was in default and each are therefore a "Debt Collectors" within the meaning of 15 U.S.C. § 1692a(6).

96. By sending false, deceptive, and misleading communications described above and conducting an improper foreclosure action and eviction through the use of this Court without the legal right to do so, NPR, Artasanchez, Bucci, and

Unknown Eviction/Cleaner Company and Employees were each individually and jointly in violation of 15 U.S.C. § 1692e.

97. NPR, Artasanchez, Bucci, and Unknown Eviction/Cleaner Company and Employees' actions described herein constitute unfair or deceptive practices in violation of 15 U.S.C. § 1692f.

98. Plaintiff has suffered actual economic and non-economic damages, as more fully described in ¶¶ 65-69 and has incurred attorney's fees and court costs as a result of Defendants' NPR, Artasanchez, Bucci, and Unknown Eviction/Cleaner Company and Employees' direct and indirect conduct.

99. The FDCPA provides for statutory damages in addition to actual damages.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in favor of Plaintiff and against the Defendants NPR, Artasanchez, Bucci, and Unknown Eviction/Cleaner Company and Employees were each individually and jointly for: actual damages in an amount not less than $250,000; statutory damages in the amount of $1,000; costs and attorney's fees incurred by Plaintiff; and grant Plaintiff such other and further relief as this court finds necessary and proper.

Respectfully Submitted,

Phillip R. Robinson
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
Attorneys for Plaintiff

## REQUEST FOR A JURY TRIAL

Plaintiff requests a jury trial on all claims asserted herein.

Phillip Robinson